(Slip Opinion)

# Department of Agriculture Preferences for "Socially Disadvantaged" Groups

The race- and sex-based preference incorporated into 16 U.S.C. § 590c's fee-waiver provision violates the Constitution's guarantee of equal protection. This conclusion is consistent with prior Executive Branch determinations with respect to other race- and sex-based preferences in programs administered by the Department of Agriculture.

Several other statutory provisions relating to Department of Agriculture programs do not violate the Constitution's guarantee of equal protection, either because they do not afford preferential treatment of any kind or because they are susceptible of race- and sex-neutral implementation.

June 22, 2026

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF AGRICULTURE

Under "our colorblind Constitution," *Allen v. Milligan*, 146 S. Ct. 1377, 1380 (2026) (per curiam), "[a]ll citizens are equal before the law," and "discrimination by the General Government, or by the States, against any citizen because of his race" is anathema, *Gibson v. Mississippi*, 162 U.S. 565, 591 (1896). Likewise, a government violates "the equal protection principle when a law or official policy denies . . . full citizenship stature" based on sex. *United States v. Virginia*, 518 U.S. 515, 532 (1996) ("*VMI*").

The Department of Agriculture ("USDA") administers various assistance, grant, loan, and outreach programs that violate these principles of American law. These statutory programs discriminate between beneficiaries based on race and sex by awarding special benefits to individuals from "socially disadvantaged" groups "whose members have been subjected to racial, ethnic, or gender prejudice." 7 U.S.C. § 2003(e)(1); *see also id.* § 2279(a)(5)–(6). And by regulation, USDA expressly designates women and certain racial groups, such as "Asians," "Blacks," and "Hispanics"—but not whites—to be socially disadvantaged. *E.g.*, 7 C.F.R. § 718.2.

You have asked whether such USDA programs violate the Constitution's equal-protection guarantee and, if so, whether their unconstitutional aspects are severable. *See* Memorandum for T. Elliot Gaiser, Assistant Attorney General, Office of Legal Counsel, from Tyler Clarkson,

1

General Counsel, Department of Agriculture, *Re: Request to Review the Constitutionality of U.S. Department of Agriculture Programs that Confer Preferences Based on Race, Ethnicity, or Sex* (Mar. 30, 2026) ("USDA Memo"). Because USDA and DOJ have already concluded that many of these programs are unconstitutional, we will not retread that same ground here. This opinion focuses on USDA programs and policies that the Executive Branch has not yet subjected to constitutional scrutiny. With one significant exception, we conclude that each remaining program or policy may be administered constitutionally.

Our analysis proceeds as follows. Part I provides background on the USDA programs we discuss in the rest of the opinion, including (1) the program established in 16 U.S.C. § 590c, and (2) five other programs, each established under title 7 or title 42 of the U.S. Code. Part II sets forth the legal frameworks for evaluating race- and sex-based classifications and for determining severability. Part III explains why the race- and sex-based preference in 16 U.S.C. § 590c violates equal-protection principles and addresses the severability of that unconstitutional preference. Part IV explains why the remaining statutory provisions—involving information-gathering and race- and sex-neutral benefits—pass constitutional muster.

## I.

During fiscal year 2025, USDA awarded over $24 billion in aid to farmers, including $14 billion in direct payments and indemnities and $10 billion in loans. *See* USDA, *FY 2027 Budget Summary* at 22, 24–25, 27 (2026), https://perma.cc/8G76-54E7. Large swaths of USDA's programs—and billions of dollars in distributed funds—are directed using race- and sex-based preferences. A more detailed description of each program appears in an appendix to this opinion. The programs include:

- *Direct financial assistance. See, e.g.*, 7 U.S.C. §§ 1983b (individual development accounts for qualified expenditures), 7333 (noninsured crop disaster relief), 8111 (payments for biomass crop production), 8711 (payments based on farm acreage), 8752 (same), 9014 (same), 9054 (dairy margin coverage payments), 9081 (supplemental agricultural disaster assistance); 16 U.S.C. §§ 2202a (water conservation cost sharing), 3839aa-2 (incentive payments for environment-friendly

2

practices), 3844 (incentive payments for participation in conservation programs);

- *Loans and loan guarantees*. *See, e.g.*, 7 U.S.C. §§ 1924 (conservation loans and loan guarantees), 1935 (farm down-payment loans), 1936 (loan guarantees for certain contract land sales), 1936c (relending loans to resolve farm ownership), 2008b (farm real estate loans and operating loans);

- *Grants*, either for farmers conducting specified activities or for entities engaging in outreach, education, and training activities for specified groups of farmers. *See, e.g.*, *id.* §§ 1524 (agricultural management assistance grants), 1627c (local agriculture market grants), 1932(e) (rural cooperative development grants), 2279 (farming opportunities training and outreach grants), 3157 (food and agricultural sciences grants), 7625 (food-safety training, outreach, and technical-assistance grants); 42 U.S.C. § 1786(m) (farmers' market nutrition grants);

- *Contracts*. *See, e.g.*, 7 U.S.C. § 1985 (sale and lease of USDA's real property); 16 U.S.C. §§ 3831c (contracts to improve soil, water, and wildlife resources), 3835 (contracts for soil conservation), 3871e (partnership agreements for conservation projects);

- *Legal rights*. *See, e.g.*, 7 U.S.C. § 2000(c)(4)(B) (right of first refusal allowing eligible USDA borrowers to reacquire homestead property); 16 U.S.C. § 3839aa-2(d)(4)(B)(i) (right to receive portion of incentive payment in advance); and

- *Representation in administrative bodies*. *See, e.g.*, 7 U.S.C. §§ 2279(g) (designating personnel to implement outreach programs), 6712(f) (composition requirements for the Greenhouse Gas Technical Assistance Provider and Third-Party Verifier Program Advisory Council); 16 U.S.C. § 590h(b)(5) (composition requirements for committees assisting with the Environmental Quality Incentives Program).

USDA and the Department of Justice ("DOJ") have separately determined that many of these programs unconstitutionally "discriminate

based on race or sex." Letter for Mike Johnson, Speaker, House of Representatives, from D. John Sauer, Solicitor General, Department of Justice, *Re: Race-and Sex-Based Preferences in USDA Programs Under Titles 7 and 16 of the United States Code* at 1 (Feb. 9, 2026) ("530D Letter"); *see also* Removal of Unconstitutional Preferences Based on Race and Sex in Response to Court Ruling, 90 Fed. Reg. 30,555, 30,556–57 (July 10, 2025).[1] We do not now further opine on the programs that have been previously addressed in the 530D Letter or in USDA's rulemaking, but we include them in our appendix for comprehensiveness and to demonstrate the consistency of our dispositions within the Executive Branch.

Of the 36 programs identified in your request, only 6 have not been previously found unconstitutional by the Executive Branch for using race- and sex-based preferences. *See* USDA Memo att. A. A brief description of those six—and their use of the term "socially disadvantaged"—follows.

*1.* USDA administers several conservation programs, including the Environmental Quality Incentives Program and the Conservation Stewardship Program. One of the benefits available under these programs is "technical assistance," which includes "services provided directly to farmers . . . such as conservation planning, technical consultation, and assistance with design and implementation of conservation practices," as well as "activities, processes, tools, and agency functions needed to support delivery of technical services, such as technical standards, resource inventories, training, data, technology, monitoring, and effects analyses." 16 U.S.C. § 590j(2)(B). Under section 590c(4), the Secretary of Agriculture may condition the receipt of conservation-

---

[1] DOJ has determined that the use of race- or sex-based preferences for socially disadvantaged farmers is unconstitutional with respect to the following statutes and their implementing regulations: 7 U.S.C. §§ 1524(a)(3), 1627c(d)(5)(C), 1627c(i)(3)(A)(ii)(II), 1924(d), 1924(e), 1932(e)(11)(B), 1935(a)(1), 1935(d), 1935(e)(2), 1936, 1936c(b), 1936c(d), 1983b(c)(3), 1985(c), 1985 note, 2000(c)(4)(B), 2003, 2008x, 2279, 2279a, 6712, 6934, 7333(k)(2), 7333(*l*)(3), 7625(c), 8111(c), 8711(d)(2), 8752(d)(2), 9014(d)(2), 9054(c)(4), 9081(a)(1), 9081(d)(4); 16 U.S.C. §§ 590h, 2202a(b), 3831c(b)(3)(E), 3839aa-2(d)(4), 3841(h), 3871e(d). *See* 530D Letter at 1–2 & n.1. USDA has rescinded regulations that had implemented such preferences under the authority of 7 U.S.C. § 2008b and 16 U.S.C. §§ 3835 and 3844—among other provisions covered by DOJ's 530D letter—based on a similar conclusion of unconstitutionality. *See* 90 Fed. Reg. at 30,556–57.

planning technical assistance on the payment of a reasonable user fee. But she may waive such fees for certain categories of farmers, including "socially disadvantaged farmers . . . (as defined in section 2003(e) of title 7)." *Id.* § 590c(4)(C)(iii). Section 2003(e), in turn, defines a "socially disadvantaged" farmer as any farmer belonging to a group "whose members have been subjected to racial, ethnic, or gender prejudice." 7 U.S.C. § 2003(e). We understand that USDA does not currently charge a user fee for conservation-planning technical assistance, *see* 7 C.F.R. pt. 610, but that USDA seeks our opinion on whether it could administer the fee waiver consistently with the Constitution.

*2.* The Federal Crop Insurance Program authorizes the Secretary to insure, through the Federal Crop Insurance Corporation, producers of certain agricultural commodities against losses caused by drought, flood, or other natural disaster. 7 U.S.C. § 1508(a)(1). The Corporation's Board must regularly review insurance plans and policies to ensure that "underserved producers"—a term defined by the statute to include socially disadvantaged farmers or ranchers, among others—are participating in insurance plans at a rate at least 50 percent of the national average participation rate. *Id.* § 1508(a)(7)(A), (B). The Board must report the results of this review to relevant congressional committees with recommendations on how "to increase participation . . . among underserved producers." *Id.* § 1508(a)(7)(C). There is no definition of "socially disadvantaged farmers or ranchers" given in this section or chapter, and the section does not reference any other statute defining the term. But under the relevant USDA regulations, a person's status as socially disadvantaged for purposes of this program hinges on race—though the regulations do not specify which racial groups qualify. *See* 7 C.F.R. § 400.701.[2]

*3.* Under 7 U.S.C. § 2204i's Land Access Reporting Requirements, the Secretary must regularly collect and report data on "trends in farmland ownership, tenure, transition, barriers to entry, profitability, and

---

[2] USDA's July 2025 rulemaking revised one regulation relating to the Federal Crop Insurance Program, eliminating the requirement that insurers include information on coverage for socially disadvantaged farmers in submissions under 7 U.S.C. § 1508(h). *See* 90 Fed. Reg. at 30,558 (revising 7 C.F.R. § 400.705). This revision did not affect or purport to decide the constitutionality of the statutory review and reporting requirements applicable to the Board under section 1508(a)(7), and for that reason we address the question here.

viability" for individuals seeking to become farmers or ranchers ("beginning farmers") and socially disadvantaged farmers or ranchers, including by surveying these farmers or ranchers. *Id.* § 2204i(b). The section refers to a statutory definition of "socially disadvantaged" from elsewhere in title 7 that classifies based on race. *Id.* § 2204i(a)(1) (referencing 7 U.S.C. § 2279(a)).

*4.* The Outreach and Assistance for Socially Disadvantaged Farmers and Ranchers Program authorizes grants to encourage and assist socially disadvantaged individuals in owning and operating farms. *See id.* § 2279. DOJ has determined that making grants under this program is unconstitutional but has not opined on the associated data-collection and disclosure requirements found in section 2279-1. *See* 530D Letter at 1 n.1. Those requirements are intended to "ensure compilation and public disclosure of data to assess and hold the Department of Agriculture accountable for the nondiscriminatory participation of socially disadvantaged farmers and ranchers in programs of the Department." 7 U.S.C. § 2279-1(a). For every county and state in the United States, the Secretary must "annually compile program application and participation rate data regarding socially disadvantaged farmers or ranchers" for each USDA program and make the data publicly available. *Id.* § 2279-1(c)(1), (3)–(4). Section 2279-1 refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* § 2279-1(b) (referencing 7 U.S.C. § 2003(e)).

*5.* The Agriculture and Food Research Initiative grants the Secretary authority to "make competitive grants for fundamental and applied research, extension, and education to address food and agricultural sciences." *Id.* § 3157(b)(1). One of the program's priority areas of research is "barriers and bridges to entry and farm viability" for socially disadvantaged farmers and ranchers, among others. *Id.* § 3157(b)(2)(F)(viii). There is no definition of "socially disadvantaged farmers or ranchers" given in this section or chapter, and the section does not reference any other statute defining the term. Neither do applicable USDA regulations define the term. *See* 7 C.F.R. § 3400.2.

*6.* Under the Farmers' Market Nutrition Program, the Secretary must award grants to the states for "the establishment or maintenance of programs designed to provide" access to "fresh, nutritious, unprepared foods at farmers' markets." 42 U.S.C. § 1786(m)(1). The Secretary must

authorize the states to use up to "2 percent of total program funds . . . to promote the development of farmers' markets in socially or economically disadvantaged areas, or remote rural areas." *Id.* § 1786(m)(5)(F)(ii). Neither the statute nor its implementing regulations define "socially or economically disadvantaged areas." *See* 7 C.F.R. § 248.2.

## II.

We have recently written at length about the constitutionality of race-based classifications, as well as the severability of statutory provisions calling for unconstitutional classifications. *See generally Constitutionality of Race-Based Department of Education Programs*, 49 Op. O.L.C. __ (Dec. 2, 2025) ("*Race-Based Education Programs*") (applying *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023) ("*SFFA*")). Our previous advice is directly relevant to the race-based element of 16 U.S.C. § 590c and, in many ways, controls our conclusion as to that provision. We begin by summarizing that advice. Next, we articulate the framework for analyzing the constitutionality of sex-based classifications. Last, we summarize our recent guidance on severability.

## A.

"[T]he Constitution almost never permits the Federal Government or a State to discriminate on the basis of race." *Louisiana v. Callais*, 146 S. Ct. 1131, 1152 (2026).[3] We have recently explained that "[a]ny allocation of benefits and burdens based on a person's race is anathema" to the equal-protection guarantee of the U.S. Constitution. *Race-Based Education Programs* at *2. We traced the history of Supreme Court jurisprudence on "benign" racial classifications, both in the context of "government grantmaking" and "affirmative action in college admissions." *Id.* at *3; *see also id.* at *3–5. In the government grantmaking context, the Court recognized over three decades ago that federal programs

---

[3] The Supreme Court has recognized an equal-protection component in the Constitution that binds the federal government. *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954) (rooting the principle in the Due Process Clause of the Fifth Amendment); *United States v. Vaello Madero*, 142 S. Ct. 1539, 1544 (2022) (Thomas, J., concurring) (finding "[f]irmer ground . . . in the Fourteenth Amendment's Citizenship Clause").

distinguishing based on a beneficiary's race are always subject to strict scrutiny, under which racial classifications "must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995). In 2023, the *SFFA* Court applied that logic to university admissions programs and provided further guidance for deciding whether a government interest is "compelling" and whether a classification is "narrowly tailored" to achieving it. 143 S. Ct. at 2162 (citations omitted). We distilled this guidance—along with further insight from Supreme Court precedent and our own past advice—in our recent memorandum for the Department of Education. *See Race-Based Education Programs* at *5–8.

Strict scrutiny runs as follows. Under the compelling-interest prong, "[t]he only interest relevant here is 'remediating specific, identified instances of past discrimination that violated the Constitution or a statute.'" *Id.* at *6 (quoting *SFFA*, 143 S. Ct. at 2162). Establishing that interest requires "particularized evidentiary findings" of unlawful discrimination "*before* [the government] embarks on an affirmative-action program." *Id.* at *7 (citation omitted). Then, in determining whether a racial classification is narrowly tailored to achieving such a compelling interest, we consider five factors: (1) whether the measure "amount[s] to a per se unconstitutional quota"; (2) whether the government has attempted "workable race-neutral alternatives"; (3) whether the measure has a "definite duration"; (4) whether the measure uses "arbitrary or undefined" racial categories; and (5) whether the government "has made appropriate steps to minimize the burden on other racial groups." *Id.* at *7–8 (citations omitted). Furthermore, "race may never be used as a 'negative,'" which suggests that "racial classifications are *never* narrowly tailored when the government uses race to allocate a zero-sum benefit." *Id.* at *8 (quoting *SFFA*, 143 S. Ct. at 2168).

## B.

Unlike race, the Constitution "does not make sex a 'proscribed classification,'" because the sexes are not always similarly situated; there are real biological differences between men and women. *United States v. Skrmetti*, 145 S. Ct. 1816, 1828 (2025) (citation omitted); *see also id.* at 1878–79 (Sotomayor, J., dissenting) ("No one disputes that . . . there are 'biological differences between men and women'" and that "such physical differences" are "one of the reasons why sex is not altogether a

proscribed classification." (citation omitted)); *Nguyen v. INS*, 533 U.S. 53, 63–64 (2001) (holding that government may "take[] into account a biological difference" between the sexes because such differences can render them "not similarly situated"). The Court has thus repeatedly affirmed that the "'[i]nherent differences' between men and women" are "cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity." *VMI*, 518 U.S. at 533.

Due to these inherent differences, sex can "represent[] a legitimate, accurate proxy" to pursue permissible legislative ends. *Craig v. Boren*, 429 U.S. 190, 204 (1976); *see also Weinberger v. Wiesenfeld*, 420 U.S. 636, 653 (1975); *Kahn v. Shevin*, 416 U.S. 351, 356 n.10 (1974). Limiting the military draft to men, for example, is not an "invidious" classification, "but rather realistically reflects the fact that the sexes are not similarly situated" for "develop[ing] a pool of potential combat troops." *Rostker v. Goldberg*, 453 U.S. 57, 79 (1981). Likewise, laws "separating sexes in some . . . circumstances"—such as in bathrooms, sleeping quarters, prisons, and athletics—may be grounded in safety considerations and "a long tradition" of recognizing real biological differences between men and women. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022); *see also, e.g.*, *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) ("Men and women simply are not physiologically the same for the purposes of physical fitness programs."); *Eline v. Town of Ocean City*, 7 F.4th 214, 221–22 (4th Cir. 2021) (differential standards for toplessness do not violate equal protection); *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996) (sex-separated prisons do not violate equal protection).

But in some cases, sex "provides no sensible ground for differential treatment" by the government. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). "[S]ex-based lines too often reflect stereotypes or overbroad generalizations about the differences between men and women." *Skrmetti*, 145 S. Ct. at 1828. To avoid reifying these stereotypes, the Supreme Court applies "heightened scrutiny" to statutes and regulations that classify based on sex. *Id.* Under the heightened-scrutiny standard, the "burden of justification is demanding and it rests entirely on" the government purveyor of a sex-based classification. *VMI*, 518 U.S. at 533. Specifically, the government "must show at least that the challenged classification serves important governmental objectives

and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (cleaned up). "The justification must be genuine, not hypothesized or invented *post hoc* . . . ." *Id.* In short, the government's reason for distinguishing based on sex must be "exceedingly persuasive." *Id.*

Under this standard, sex-based preferences in government programs will not easily satisfy equal protection's requirements. "[T]he party defending the statute must present sufficient probative evidence in support of its stated rationale for enacting a [sex] preference." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) (cleaned up). But "the evidentiary basis necessary to demonstrate [an] important governmental interest [is] something less than" the particularized evidentiary findings of discrimination required under strict scrutiny. *Concrete Works of Colo., Inc. v. City & County of Denver*, 321 F.3d 950, 959–60 (10th Cir. 2003); *see also Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1010 (3d Cir. 1993). We have long advised that "mere findings of disparity or underrepresentation are generally not sufficient to establish the constitutionality of a gender-based preference program." *Constitutionality of Federal Government Efforts in Contracting with Women-Owned Businesses*, 32 Op. O.L.C. 23, 25 (2008) ("*Women-Owned Businesses*"). Rather, the government must identify "genuine and non-hypothetical evidence of discrimination in the economic sphere in which the program will operate." *Id.* at 26.

As for whether sex-based preferences are "substantially related to the achievement of [important] objectives," *VMI*, 518 U.S. at 533 (citation omitted), courts have distilled three factors to consider. *First*, the scheme must have a "close means-end fit," meaning that "the gender-based means . . . serve the posited end." *Sessions v. Morales-Santana*, 582 U.S. 47, 67–68 (2017); *see also Craig*, 429 U.S. at 204 (holding that a law against selling alcohol to young men was not substantially related to traffic safety because it did not forbid them from drinking alcohol obtained through other means). A pointless sex-based classification does not pass muster. *Second*, a degree of tailoring—albeit not the narrow tailoring required by strict scrutiny—is needed. Overbreadth can be fatal. *See Vitolo v. Guzman*, 999 F.3d 353, 365 (6th Cir. 2021); *accord Orr v. Orr*, 440 U.S. 268, 282–83 (1979) ("A [sex]-based classification which . . . generates additional benefits only for those it has no reason to prefer cannot survive equal protection scrutiny."). *Third*, the existence of sex-

neutral alternatives for achieving the desired end may render a sex-based distinction impermissible. *See Morales-Santana*, 582 U.S. at 63 n.13 (noting that the Court "reject[s] measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn"); *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 151 (1980) (invalidating a law preferencing widows over widowers because the needs of each group "would be completely served either by paying benefits to all members of both classes or by paying benefits only to those members of either class who can demonstrate their need").

## C.

Our recent memorandum for the Department of Education also offered guidance on whether an unconstitutional provision may be severed from its broader statutory scheme. *See Race-Based Education Programs* at *13–16. We acknowledged that an unconstitutional provision is presumptively severable from the rest of the statute to which it belongs while also explaining that the presumption "is overcome either where a statute is not 'capable of functioning independently' without the unconstitutional provisions or where the statute would not 'function in a *manner* consistent with the intent of Congress.'" *Id.* at *14 (citations omitted). "[M]indful of the separation-of-powers considerations inherent" in severability questions, we advised severance only where it would not require the Executive Branch to "assume the legislative function" by rewriting a statute to make it workable. *Id.* at *15 (alteration accepted) (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 692 (2012) (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting)).

## III.

We now apply these legal standards to USDA's race- and sex-based preference for "socially disadvantaged farmers or ranchers" in providing conservation-planning technical assistance. *See* 16 U.S.C. § 590c(4)(C)(iii). Recall that under this provision, the Secretary may waive fees that would otherwise be charged for conservation-planning technical assistance. *Id.* The waiver provision incorporates the definition of socially disadvantaged farmers from 7 U.S.C. § 2003(e), which expressly tethers social disadvantage to a farmer's "identity" as an individual belonging to "a group whose members have been subjected

to racial, ethnic, or gender prejudice." Because the statute makes waiver availability dependent on race or sex, strict and heightened scrutiny, respectively, apply.

Before turning to that analysis, we confront two threshold arguments. *First*, some might argue that "socially disadvantaged"—as defined in 7 U.S.C. § 2003(e)(1)—does not classify based on race or sex but rather on membership in a group that has historically faced "prejudice" because of race or sex. *Id.* Perhaps that classification is formally neutral, albeit race- and sex-conscious; it might "permit individuals of any race [or sex] to be considered 'socially disadvantaged,'" provided they demonstrate that their race or sex has experienced a history of prejudice. *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 64 (D.C. Cir. 2016) (considering the Small Business Administration's preference for "socially disadvantaged" applicants to its 8(a) program); *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 988 (9th Cir. 2005) (In the Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, 112 Stat. 107 (1998), "the term 'socially and economically disadvantaged' is race- and sex-neutral on its face." (citation omitted)). After all, the mere fact that a race- or sex-neutral distinction may "disproportionate[ly]" favor farmers of certain races or sexes does not necessarily mean it classifies based on race or sex and triggers increased scrutiny. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 526 (1989) (Scalia, J., concurring in the judgment); *see also Skrmetti*, 145 S. Ct. at 1833 (applying *Geduldig v. Aiello*, 417 U.S. 484 (1974)).

But that argument is wrong. Section 590c—along with other provisions that share its definition of social disadvantage—classifies based on race and sex because its preference hinges on membership in groups deemed disadvantaged. It links benefit eligibility to a farmer's "member[ship] [in] a socially disadvantaged group," which depends on shared "racial, ethnic, or gender . . . identity." 7 U.S.C. § 2003(e). That classification scheme does not exclusively focus on race- or sex-neutral criteria like "an individual applicant's experience of discrimination." *Rothe*, 836 F.3d at 64. Rather, it necessarily "group[s] together" all farmers belonging to certain races or sexes. *SFFA*, 143 S. Ct. at 2167. To implement the statute's waiver provision, USDA must make determinations about whether *groups* have faced prejudice or bias, not individuals. Once that determination is made, any member of the group qualifies for preferential treatment—irrespective of whether the *individual* has personally

experienced prejudice or bias based on his or her membership in that group. *Contrast Rothe*, 836 F.3d at 64 ("On its face, section 637(a)(5) envisions an individual-based approach that focuses on experience rather than on a group characteristic.").[4] Congress's "message is clear—groups suffer discrimination and therefore persons who are members of those groups are socially disadvantaged." *Id.* at 76 (Henderson, J., concurring in part and dissenting in part).

When a statute uses a race- or sex-based criterion (membership in a racial group or sex) *plus* a race- and sex-neutral criterion (the group has suffered past prejudice), that combined standard remains a race- or sex-based classification. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (per curiam) (holding that sex, considered in conjunction with a second characteristic, can delineate a protected group). Thus, social disadvantage for the USDA is "defined by . . . the farmer's race" or, as the case may be, sex. *Black Farmers & Agriculturalists Ass'n v. Rollins*, 154 F.4th 473, 475 (6th Cir. 2025). Any "*group* classification" that divides individuals along racial lines to treat some racial groups preferentially is constitutionally suspect. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (citation omitted). And when "the race, not the person, dictates" eligibility for favorable treatment by the government, strict scrutiny applies. *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984). Likewise, preferential treatment based purely on sex triggers heightened scrutiny. *VMI*, 518 U.S. at 532–33.

As a result, the statutory definition itself guarantees that farmers belonging to some racial and sex groups will be eligible for a fee waiver while others will not. After all, disadvantage is a relative concept. *See Webster's Third New International Dictionary* 643 (1993 ed.) (defining "disadvantage" as "an unfavorable, inferior, or prejudicial condition"); *see also Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 589 (2004) (analyzing congressional findings about the "'disadvantage of older persons' . . . 'relative to the younger ages'" in employment (citations omitted)). Farmers belonging to at least one racial group—the one

---

[4] As *Rothe* attests, the analysis would be different if the statute permitted a construction under which anyone could apply for the benefit (irrespective of race or sex) and social disadvantage were keyed to the applicant's *individual* experience of racial or sex-based prejudice. Such an "individual-based approach" could be race- and sex-neutral because "victims of discrimination do not comprise a racial or ethnic [or sex] group." 836 F.3d at 64.

deemed to be most socially advantaged—will be categorically ineligible for the waiver available to socially disadvantaged farmers, purely because of their race. So, too, with sex. Although USDA regulations do not currently implement section 590c's waiver provision—because the Secretary has elected not to charge a fee for technical assistance at all—the regulations bear out the implication that not all races or sexes can be socially disadvantaged. They expressly exclude white and male farmers from the list of socially disadvantaged groups. *See, e.g.*, 7 C.F.R. § 718.2. The regulations evince what the statute requires: that at least some farmers be excluded from benefits based on the race or sex to which those farmers belong. Because USDA cannot, under the statutory definition provided by Congress, classify all racial groups or both sexes as socially disadvantaged, section 590c is necessarily race- and sex-based and must therefore survive strict and heightened scrutiny, respectively. Congress cannot shield its racially and sexually discriminatory scheme from scrutiny merely by punting to USDA the designation of which race- or sex-based groups receive special favor.

*Second*, "considerations of constitutional avoidance might counsel in favor of a narrowing construction" of the term socially disadvantaged. *Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1296 n.6 (2025). A plausible alternative interpretation that disregards race and sex might avoid the equal-protection problem. But the canon of constitutional avoidance applies only "when statutory language is susceptible of multiple interpretations"; it cannot be used to "rewrite" a statute. *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). "Constitutional avoidance is not a license to rewrite Congress's work to say whatever the Constitution needs it to say in a given situation." *Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2207 (2020). Here, the statutory definition of "socially disadvantaged" is clear. A farmer falls under its umbrella by belonging to a "group" that shares a "racial, ethnic, or gender . . . identity." 7 U.S.C. § 2003(e)(1). Congress contemplated no other characteristic by which a farmer could demonstrate social disadvantage. Because the text is clear, we cannot disregard its classification to give the statute a saving construction.

If we implausibly interpreted "socially disadvantaged" as necessarily including every race or both sexes, even more problems would arise. The resulting reading would be inconsistent with the relative nature of "disadvantage" explained above. And it would make a hash of the statutory schemes by extending the fee waiver reserved for socially disadvantaged

farmers to *all* farmers—an outcome Congress obviously did not contemplate. If all farmers were eligible for the fee waiver under the "socially disadvantaged" label, then there would be no need to authorize a fee waiver for them; the Secretary could simply exercise his discretion under the statute not to impose a fee for technical assistance. This saving interpretation of "socially disadvantaged farmers" would thus be inconsistent with "the statutory text and structure" of section 590c. *See Seila Law*, 140 S. Ct. at 2207. The constitutional issue here is unavoidable.

We therefore evaluate whether the race- and sex-based preference in section 590c can survive strict and heightened scrutiny, respectively, and whether, if unconstitutional, this preference is severable from the rest of the fee provision. We begin with the race-based component, concluding that it is unconstitutional but severable—a conclusion that agrees with USDA's and DOJ's previous analysis. We then consider the sex-based component and draw the same conclusion.

## A.

### 1.

We begin by asking whether the only relevant interest that is sufficiently compelling to justify racial preferences—"remediating specific, identified instances of past discrimination that violated the Constitution or a statute," *SFFA*, 143 S. Ct. at 2162—is present in the context of the fee waiver under section 590c. We conclude that it is not.

It is Congress's burden, before enacting race-based classifications, to identify "a 'strong basis in evidence' to conclude that remedial action was necessary." *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1249–50 (2022) (emphasis and citation omitted); *accord Race-Based Education Programs* at *6–7. Congress did not do so with respect to any of the programs or policies under consideration. Generally, we look for "particularized evidentiary findings" in the relevant legislation to determine that an interest in remedying past discrimination is compelling. *Id.* at *7. In none of the statutes covering USDA's race-based programs has Congress included even a single enacted finding relating to racial discrimination in agriculture—much less a finding that such

discrimination "violated the Constitution or a statute." *SFFA*, 143 S. Ct. at 2162.[5]

Outside of enacted legislative findings, courts have occasionally "probe[d] more deeply into the legislative history" to see whether there is evidence of specific episodes of discrimination. *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1167 (10th Cir. 2000); *see id.* at 1167–75 (citing extensive findings in congressional reports and administrative findings). But although Congress has held hearings on discrimination in USDA programs, *see Holman v. Vilsack*, No. 21-1085-STA-JAY, 2021 WL 2877915, at *3 n.8 (W.D. Tenn. July 8, 2021), we have not seen any congressional findings, enacted or unenacted, pointing to specific incidents of unlawful racial discrimination in this field, *de jure* or otherwise. *See Race-Based Education Programs* at *19–20.[6]

True, there have been administrative reports of alleged racial discrimination in USDA lending that have apparently been brought to Congress's attention. *See Holman*, 2021 WL 2877915, at *2–3 & n.8 (describing these reports and the congressional hearings in which they were

---

[5] *See generally* Agricultural Credit Act of 1987, Pub. L. No. 100-233, 101 Stat. 1568 (1988); Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624, 104 Stat. 3359; Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, 108 Stat. 3178; Healthy Meals for Healthy Americans Act of 1994, Pub. L. No. 103-448, 108 Stat. 4699; Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134; Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651; FDA Food Safety Modernization Act, Pub. L. No. 111-353, 124 Stat. 3885 (2011); Bipartisan Budget Act of 2013, Pub. L. No. 113-67, 127 Stat. 1165; Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 649; Bipartisan Budget Act of 2018, Pub. L. No. 115-123, 132 Stat. 64; Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022).

[6] The closest thing to such a finding we have found is a note that "the number of socially disadvantaged farmers has declined at an increasing rate as a result of limited educational opportunities and other related factors." H.R. Rep. No. 101-916, at 1215 (1990) (Conf. Rep.). There is conspicuously no mention of discrimination. What little else appears in the legislative record on this issue falls well short of the required showing for a compelling governmental interest. For instance, Congress expressed support for discrimination lawsuits against USDA by guaranteeing all claimants "a determination on the merits" and by urging "expeditious" resolutions. Pub. L. No. 110-246, §§ 14011, 14012(b), 122 Stat. at 2209–10. But it made no findings itself concerning the merits of those lawsuits. A 2021 Senate bill included findings of the sort that might be considered in assessing whether a compelling interest in redressing discrimination exists. *See* Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong. § 2. But the bill did not pass, and its findings were not included in subsequent legislation.

presented). And USDA has settled "a 'series of lawsuits . . . by groups of minority farmers'" alleging the same. *Id.* at *2. But Congress is "the institution that ma[de] the racial distinction" in its statutory enactments and is thus responsible for verifying that there is specific evidence of past discrimination in need of a race-based remedy. *Shaw v. Hunt*, 517 U.S. 899, 910 (1996). To the extent Congress's legislation on behalf of socially disadvantaged farmers relied on miscellaneous reports from the Executive Branch or the claims of litigants, Congress gave no indication of such reliance or its intent to incorporate any alleged factual findings therein. At best, Congress adopted "generalized assertion[s] of past discrimination in a particular industry," which do not suffice to establish a compelling interest. *Id.* at 909; *cf. Race-Based Education Programs* at *31 (finding "the well-documented history of racial discrimination against black Americans in higher education" to be insufficient evidence of a compelling interest when Congress had made no specific findings prior to the relevant statute's enactment).

In the absence of contemporaneous, particularized findings of unlawful racial discrimination, Congress failed to identify a compelling interest for race-based fee waivers.

## 2.

Because strict scrutiny demands a compelling governmental interest, our analysis could end there. But for thoroughness, we also evaluate whether the fee waiver at issue is narrowly tailored to achieve a purported interest in remedying past racial discrimination. On this score, too, USDA's race-based policy falls short.

To start, section 590c relies on notably "imprecise" racial formulations. *SFFA*, 143 S. Ct. at 2167. The statutory definition of socially disadvantaged farmers "group[s] together" all members of any race that has been subjected to racial or ethnic prejudice. *Id.*; *see* 7 U.S.C. § 2003(e)(1). Such a group classification necessarily relies on "overbroad," "arbitrary," or "undefined" racial categories because it assumes a common experience of prejudice rather than evaluating an individual's specific history. *SFFA*, 143 S. Ct. at 2167. This approach is unacceptable for at least two reasons. *First*, these vague racial categories diminish the likelihood that the relevant programs and policies will succeed at addressing real effects of past discrimination. *Cf. id.* at 2168 (finding that racial classifications failed strict scrutiny because of "the mismatch

between the means . . . employ[ed] and the goals [sought]"). Using over-broad and imprecise racial groupings is likely to benefit individuals who have not, in fact, been impacted by past discrimination while excluding others who have. *Second*, such sweeping racial classifications reflect intolerable "stereotyping" because they "intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Id.* at 2170 (citation omitted). Laws that "assert the connection" between race and disadvantage "conclusively"—as section 590c does—are especially concerning. *Race-Based Education Programs* at *43.

What is more, section 590c's race-based preference in granting fee waivers has no "logical end point." *Grutter*, 539 U.S. at 342. There is no mechanism to ensure that the benefits to members of preferred racial groups "will not last longer than the discriminatory effects [they are] designed to eliminate." *Adarand*, 515 U.S. at 238 (citation omitted).

In addition to the lack of a compelling interest, the racial classification in section 590c is unconstitutional because it fails narrow tailoring, just like the other statutory and regulatory preferences for socially disadvantaged farmers found unconstitutional by USDA and DOJ.

### B.

#### 1.

Our inquiry into whether the sex-based component of section 590c serves "important governmental objectives" follows a similar track. *VMI*, 518 U.S. at 533 (citation omitted). Congress has pointed to no evidentiary findings to support differential treatment in agriculture programs and policies based on sex. The record is devoid of even a scintilla of evidence—much less "sufficient probative evidence," *H.B. Rowe*, 615 F.3d at 242 (citation omitted)—that such discrimination occurred before section 590c was enacted. Congress cannot enact such a sex-based preference "[w]ithout a showing of discrimination against women" in government-provided agricultural benefits, "or at least in the industry in general." *Dallas Fire Fighters Ass'n v. City of Dallas*, 150 F.3d 438, 442 (5th Cir. 1998). Mere "disparity or underrepresentation" in farming and ranching is "not sufficient." *Women-Owned Businesses*, 32 Op. O.L.C. at 25.

**2.**

For the sake of thoroughness, we proceed to ask whether the sex-based classification in section 590c's fee waiver provision is substantially related to a supposed interest in correcting the effects of past sex discrimination in agriculture. It is not.

A fee waiver for conservation-planning technical assistance could ostensibly increase women's participation and opportunities for success in certain agricultural programs, thereby "serv[ing] the posited end" of remedying discrimination against women. *Morales-Santana*, 582 U.S. at 67. But it is hard to know just how "close" the means and end fit together without any indication from Congress about the end it intended to pursue. *Id.* at 68. In any event, the preference for women here lacks a substantial relation to hypothetical remedial ends for two reasons.

*First*, it is overbroad. As in the scheme reviewed by the Sixth Circuit in *Vitolo*, the purpose of the fee waiver is not to aid women only, but rather to assist "disadvantaged" individuals, of which some women may be only a subset. 999 F.3d at 365 (evaluating a program "designed to [benefit] applicants hardest hit by the pandemic" and therefore "economically disadvantaged" (citation omitted)). By assuming "*all*" women are disadvantaged, the fee waiver goes further than needed to assist women who face the hurdles that Congress may have intended to knock down. *Id.* The waiver benefits *any* woman farmer simply by virtue of her being a woman, independent of her actual disadvantages with respect to farming. This "sex-based line[]" thus "reflect[s] stereotypes or overbroad generalizations" about the ability of women to farm or ranch. *Skrmetti*, 145 S. Ct. at 1828. Because the fee waiver provision "generates additional benefits . . . for [a sex] it has no reason to prefer," it "cannot survive equal protection scrutiny." *Orr*, 440 U.S. at 282–83.

*Second*, there are workable sex-neutral alternatives that are just as likely to assist women in overcoming potential past discrimination in agriculture. To the extent the fee waiver was meant to lower entry barriers faced by female farmers, the provision for beginning farmers effectively serves that end without regard to sex. *See* 16 U.S.C. § 590c(4)(C)(i). That end "would be completely served . . . by paying benefits to all members of both classes," men and women farmers alike. *Wengler*, 446 U.S. at 151. And to the extent the fee waiver was meant to assist individual women who have comparatively fewer financial

resources, the fee waiver is available to "limited resource farmers." 16 U.S.C. § 590c(4)(C)(ii). Here, then, Congress has proven capable of tailoring relief in a way agnostic to sex "by paying benefits only to those members of either class who can demonstrate their need." *Wengler*, 446 U.S. at 151.

Try as we might, we see no "exceedingly persuasive justification" for allowing USDA to extend special treatment to farmers based exclusively on their sex. *VMI*, 518 U.S. at 534. Given the existing record, such unjustified discrimination—based on nothing more than a farmer's sex— runs afoul of the constitutional commitment to equal protection.

## C.

Having concluded that section 590c's fee waiver fails strict and heightened scrutiny, we now turn to the question of whether this provision is severable from the broader provision of which it is a part. It is.

Nothing about section 590c overcomes the presumption of severability. The statutory section is capable of "functioning independently" of the race- and sex-based classifications in the fee waiver provision, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 509 (2010) (citation omitted), because the fee waiver available to socially disadvantaged farmers is also available to members of various other groups— such as beginning and limited-resource farmers and farmers who experience social disadvantage for reasons other than their race or sex, *see* 16 U.S.C. § 590c(4)(C)(i)–(iii). Were the race- and sex-based preference stripped away, the fee waiver could still permissibly be extended to individuals identified based on their level of farming experience or economic resources. *Cf. SFFA*, 143 S. Ct. at 2170 (noting that equal protection does not prohibit "treating [someone] differently because they are from a city or from a suburb"). Such classifications, even standing alone, would be workable race- and sex-neutral alternatives that are likely to benefit a wide variety of individuals, including farmers who are women or who belong to minority racial groups. In short, the fact that the fee waiver also benefits groups other than those defined by race or sex supports severability. *See Race-Based Education Programs* at *41–42.

Neither is there any indication that severing the race- and sex-based preference would keep the fee waiver provision from "function[ing] in a *manner* consistent with the intent of Congress." *Id.* at *14 (quoting

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987)). At bottom, section 590c(4)(C) was not designed to benefit members of specific racial groups or women exclusively, as were many of the programs we analyzed in our memorandum for the Department of Education last year. *See, e.g.*, *id.* at \*21–22 (finding racial components of a program inseverable because "the purposes [of the program] . . . in large part turn on ethnicity"). Instead, it was designed to help farmers access certain conservation benefits. Certainly, Congress singled out some subsets of farmers for special assistance—including socially disadvantaged, beginning, and limited-resource farmers. But nothing about the statute suggests that Congress "would not have enacted" the fee-waiver provision without its race- or sex-based preference. *Alaska Airlines*, 480 U.S. at 685. Without that impermissible preference, the Secretary may still elect to waive the fee, to the extent she charges one, for beginning or limited-resource farmers and others eligible under the statute. *See* 16 U.S.C. § 590c(4)(C).

The parenthetical cross-reference to section 2003's unconstitutionally race-based definition should therefore be severed and may not be given effect. With that change, the term "socially disadvantaged farmers" in section 590c would become undefined. For the reasons explained in Part IV, that phrase is susceptible to a race- and sex-neutral interpretation and must be administered accordingly.

## IV.

The five remaining programs and policies under consideration do not violate equal protection.

Three of these programs and policies—the Federal Crop Insurance Program, 7 U.S.C. § 1508; the Land Access Reporting Requirements, *id.* § 2204i; and the Outreach and Assistance for Socially Disadvantaged Farmers and Ranchers Program, *id.* § 2279-1—do not "distribute[] burdens or benefits," *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007), or accord "preferential treatment" at all, *SFFA*, 143 S. Ct. at 2205 (Thomas, J., concurring), and thus do not raise equal-protection concerns on their face. Instead, they require USDA to collect, review, and report data concerning socially disadvantaged farmers, including participation rates, barriers, and outcomes in federally supported farming programs. Although we have reservations about Congress engaging in the "sordid business" of "divvying us up by

race," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part), we conclude that these requirements likely fall within constitutional boundaries and within the ambit of Congress's powers to collect demographic information on the beneficiaries of USDA programs, *cf. Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __, at *17 (Apr. 1, 2026); *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020). Of course, if Congress or USDA were to classify farmers by race or sex in reliance on such data, their actions would be subject, respectively, to strict or heightened scrutiny.

The final two programs—the Agriculture and Food Research Initiative, 7 U.S.C. § 3157, and the Farmers' Market Nutrition Program, 42 U.S.C. § 1786(m)—do confer governmental benefits (grants), but only in race- and sex-neutral ways. The facial race- and sex-neutrality of a policy mitigates equal-protection concerns. After all, "[t]he moral imperative of racial neutrality is the driving force of the Equal Protection Clause." *Croson*, 488 U.S. at 518 (Kennedy, J., concurring in part and concurring in the judgment); *see also id.* at 526 (Scalia, J., concurring in the judgment) (government programs "may well have racially disproportionate impact" and yet not be "based on race"). But even a policy that is facially race-neutral may be unconstitutional if it is adopted for a "racially discriminatory intent or purpose." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). We identify no such impermissible purpose here.

The research initiative under section 3157 merely authorizes grants for research into "barriers and bridges to entry and farm viability" for socially disadvantaged farmers, among others. 7 U.S.C. § 3157(b)(2)(F)(viii). As noted, the section does not define the term "socially disadvantaged farmers," nor does it refer to any other provision that does. Although title 7 elsewhere uses race- and sex-conscious language in defining this term, *see id.* §§ 2003(e)(1), 2279(a)(5)–(6), "considerations of constitutional avoidance . . . counsel in favor of a narrowing construction" here, where the statutory term is undefined, *Feliciano*, 145 S. Ct. at 1296 n.6. After all, "[i]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems." *Legal Authorities Supporting the Activities of the National Security Agency Described by*

*the President*, 30 Op. O.L.C. 1, 34 (2006) (cleaned up) (quoting *INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001)); *see, e.g.*, *Whether Eluding Inspection Under 8 U.S.C. § 1325(a)(2) Is a Continuing Offense*, 49 Op. O.L.C. __, at *10–12 (June 21, 2025). Unlike section 590c—which adopted the race- and sex-based definition from 7 U.S.C. § 2003(e)—an acceptably race- and sex-neutral alternative interpretation of section 3157 is fairly possible.

But even if the term "socially disadvantaged . . . farmers" in section 3157 imported race- or sex-based classifications used elsewhere in title 7, the initiative does not dole out benefits or burdens based on those classifications. Grants are available to any researcher, regardless of the researcher's race or sex. *Cf. Rothe*, 836 F.3d at 64 (finding no constitutional violation when "[m]any individuals—of all races" are eligible for a government benefit). The only role race or sex could play in the initiative—if "socially disadvantaged farmers" were interpreted to mean farmers belonging to limited race or sex groups—would be to determine which farmers may be the subject of research. Under the requisite constitutional scrutiny, race or sex could not play any role in determining the identity of the grant recipients themselves. But just as Congress likely can require the government to gather racial demographic data to facilitate legislation, it likely can fund private research gathering such data. *Cf. Mazars*, 140 S. Ct. at 2031. This is not a situation where a government benefit flows indirectly from an institution to specific racial groups served by the institution. *Contrast Race-Based Education Programs* at *16–33 (applying strict scrutiny to programs conferring benefits on "Hispanic-Serving Institutions" and other institutions due to the racial compositions of their student bodies).

The Farmers' Market Nutrition Program is similarly neutral in how it distributes grants. *See* 42 U.S.C. § 1786(m)(5)(F)(ii). Section 1786 assists "the development of farmers' markets in socially or economically disadvantaged areas, or remote rural areas, where individuals eligible for participation in the program have limited access to grown fruits and vegetables." *Id.* Unlike other programs that confer special benefits on socially disadvantaged *farmers*, this program directs funding to socially disadvantaged *areas*, where people of any race or sex might live. Social disadvantage is otherwise unmentioned in the Child Nutrition Act of 1966, Pub. L. No. 89-642, 80 Stat. 885, so there are no textual inferences to be drawn here from a statutory definition, consistent usage, or

surplusage. *Cf. Pulsifer v. United States*, 144 S. Ct. 718, 735 (2024). Further, we understand that USDA's implementing regulations have never used race- or sex-based standards for allocating assistance to such farmers' markets.

Because it is plausible to interpret "socially and economically disadvantaged areas" as referring to race- and sex-neutral forms of social disadvantage—such as areas with low rates of educational achievement, low income, or high unemployment—we again deploy constitutional avoidance and interpret the program as operating in a race- and sex-neutral fashion. Being "disadvantaged" means one has "social problems . . . which make it difficult for a person to succeed." *Black's Law Dictionary* 580 (12th ed. 2024). Such problems may be purely social, as with a "lack of education," or they may have an economic element as well, as with "low income." *Id.* But in neither instance is disadvantage necessarily tethered to race or sex. Under our interpretation of the statutory phrase, residents of socially and economically disadvantaged areas "do not comprise a racial or ethnic group" or belong to a single sex, meaning that the preference they receive under the program is not constitutionally suspect. *Rothe*, 836 F.3d at 64.

Because none of these programs or policies affords preferential treatment based on race or sex, there is no need to subject them to further constitutional scrutiny.

## V.

For the foregoing reasons, five of the six programs and policies we have considered do not violate the Constitution. The information-gathering provisions do not distribute benefits or burdens based on race or sex. And unlike other USDA programs found unconstitutional, the Agriculture and Food Research Initiative and the Farmers' Market Nutrition Program may—and, to avoid serious constitutional questions, must—operate in a race- and sex-neutral fashion that avoids constitutional difficulty.

By contrast, the fee waiver available to socially disadvantaged farmers under 16 U.S.C. § 590c is unconstitutional because it confers special favor based on race and sex without satisfying either strict or heightened scrutiny. Based on the record before us, we cannot conclude that purportedly remedial legislation furthers a compelling or even an important governmental interest. And even if there were such an interest, a fee

waiver based on race or sex is not narrowly tailored to remedy past discrimination. Consistent with the previous determinations of USDA and DOJ, we conclude that this race- and sex-based preference is unconstitutional.

JOSHUA J. CRADDOCK
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

## Appendix

Below are general descriptions of the programs and policies identified to us by USDA as involving race- and sex-based classifications. Each entry describes the relevant program or policy, how it classifies based on race or sex, and the special benefits granted based on race or sex. We have combined statutory provisions from separate sections when they form part of a single program or policy. Programs or policies marked with an asterisk (*) were previously addressed by DOJ in its 530D Letter, while those marked with a cross (†) were deemed unconstitutional by USDA in its July 2025 rulemaking. *See* Letter for Mike Johnson, Speaker, House of Representatives, from D. John Sauer, Solicitor General, Department of Justice, *Re: Race-and Sex-Based Preferences in USDA Programs Under Titles 7 and 16 of the United States Code* at 1 (Feb. 9, 2026); Removal of Unconstitutional Preferences Based on Race and Sex in Response to Court Ruling, 90 Fed. Reg. 30,555 (July 10, 2025).

The only program we have excluded from this appendix is the Farm Ownership Outreach Program to Socially Disadvantaged Individuals. *See* Pub. L. No. 100-233, § 623, 101 Stat. 1568, 1685 (1988) (codified at 7 U.S.C. § 1985 note). We have seen no evidence that this program was funded beyond 1995. *See* Pub. L. No. 101-624, § 1852, 104 Stat. 3359, 3837 (1990). In fact, it appears that the program was subsumed into the broader outreach program under 7 U.S.C. § 2279. *See id.* § 2279(b) (outreach focusing on assisting "socially disadvantaged farmers," among others, in "the ownership and operation of farms and ranches"). To the extent the older program is still in effect, DOJ's determination as to section 2279 would apply.

### Federal Crop Insurance Program, 7 U.S.C. § 1508

*Description*: The Secretary is authorized to insure producers, through the Federal Crop Insurance Corporation, of certain agricultural commodities against losses caused by drought, flood, or other natural disaster. 7 U.S.C. § 1508(a)(1).

*Classification*: The Corporation's Board must regularly review insurance plans and policies to ensure that "underserved producers"—defined to include socially disadvantaged farmers or ranchers, among others— are participating in crop insurance plans at a rate at least 50 percent of

the national average participation rate. *Id.* § 1508(a)(7)(A), (B). The Board must report the results of this review to relevant congressional committees with recommendations "to increase participation . . . among underserved producers." *Id.* § 1508(a)(7)(C).

There is no definition of "socially disadvantaged farmers or ranchers" given in this section or chapter, and the section does not reference any other statute defining the term. Under the relevant USDA regulations, however, one's status as socially disadvantaged for purposes of this program hinges on race—though the regulations do not specify which racial groups qualify. *See* 7 C.F.R. § 400.701.

## Agricultural Management Assistance Program, 7 U.S.C. § 1524*

*Description*: "The Secretary . . . shall establish a program under which competitive grants are made to qualified public and private entities . . . for the purpose of educating agricultural producers and providing technical assistance to agricultural producers on a full range of farm viability and risk management activities . . . ." 7 U.S.C. § 1524(a)(2)(A).

*Classification*: The Secretary must "place special emphasis" on "strategies . . . , education, and outreach specifically targeted at . . . socially disadvantaged farmers or ranchers," among other groups. *Id.* § 1524(a)(3).

There is no definition of "socially disadvantaged farmers or ranchers" given in this section or chapter, and the section does not reference any other statute defining the term. Under the relevant USDA regulations, however, one's status as socially disadvantaged for purposes of this program hinges on race—though the regulations do not specify which racial groups qualify. *See* 7 C.F.R. § 1465.3.

## Local Agriculture Market Program, 7 U.S.C. § 1627c*

*Description*: This program "supports the development, coordination, and expansion" of "(A) direct producer-to-consumer marketing; (B) local and regional food markets and enterprises; and (C) value-added agricultural products." 7 U.S.C. § 1627c(b)(1). The Secretary is authorized to provide grants for eligible activities germane to those purposes, including running and promoting farmers' markets and agritourism. *Id.* § 1627c(d). The statute that initiated this program only authorized grants for fiscal years 2019 through 2023, but subsequent appropriations statutes have continued to extend it. *See* Pub. L. No. 119-37, div. E, § 5002, 139 Stat. 495, 626–27 (2025).

*Classification*: The Secretary must "give priority to applications" from socially disadvantaged farmers or ranchers, among others, for grants for eligible activities. 7 U.S.C. § 1627c(d)(5)(C). Ten percent of funds for these grants must be reserved for socially disadvantaged farmers or ranchers, as well as for beginning and veteran farmers. *Id.* § 1627c(i)(3)(A)(ii)(II).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* § 1627c(a)(11) (referencing 7 U.S.C. § 2003(e)). The relevant USDA regulations reflect these same classifications too—though they do not specify which racial or sex groups qualify. *See* 7 C.F.R. § 4284.903.

**Conservation Loan and Loan Guarantee Program, 7 U.S.C. § 1924***

*Description*: The Secretary is authorized to "make or guarantee qualified conservation loans to eligible borrowers," which broadly includes "farmers or ranchers in the United States, farm cooperatives, private domestic corporations, partnerships, joint operations, trusts, limited liability companies, or such other legal entities as the Secretary considers appropriate that are controlled by farmers or ranchers and engaged primarily and directly in agricultural production in the United States." 7 U.S.C. § 1924(a), (c)(1).

*Classification*: "In making or guaranteeing" conservation loans, the Secretary must "give priority to" socially disadvantaged farmers or ranchers, along with beginning farmers and producers who would use the loans for identified purposes. *Id.* § 1924(d). The Secretary may also guarantee a higher percentage of a loan held by socially disadvantaged farmers or ranchers and beginning farmers than of a loan held by other types of candidates. *Id.* § 1924(e).

There is no definition of "socially disadvantaged farmers or ranchers" given in this section or chapter, and the section does not reference any other statute defining the term. Under the relevant USDA regulations, however, one's status as socially disadvantaged for purposes of this program hinges on race—though the regulations do not specify which racial groups qualify. *See* 7 C.F.R. § 701.2.

**Rural Cooperative Development Grants Program, 7 U.S.C. § 1932(e)***

*Description*: The Secretary is authorized to "make grants . . . to non-profit institutions for the purpose of enabling the institutions to establish

and operate centers for rural cooperative development." 7 U.S.C. § 1932(e)(2).

*Classification*: Twenty percent of the funds appropriated for rural cooperative development grants must be reserved for cooperatives that serve socially disadvantaged groups and whose boards have a majority of members belonging to such groups. *Id.* § 1932(e)(11)(B).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* § 1932(e)(11)(A) (referencing 7 U.S.C. § 2003(e)). USDA regulations provide no additional guidance. *See* 7 C.F.R. § 4284.503.

### Down Payment Loan Program, 7 U.S.C. § 1935[*]

*Description*: This program allows the Secretary to make loans "to eligible farmers or ranchers for down payments on farm ownership loans." 7 U.S.C. § 1935(a)(1).

*Classification*: The statute defines "eligible farmer or rancher" as (1) "a qualified beginning farmer or rancher," (2) "a socially disadvantaged farmer or rancher," or (3) "a veteran farmer or rancher." *Id.* § 1935(e). The Secretary must also coordinate with "State programs that provide farm ownership or operating loans" to the same groups of farmers. *Id.* § 1935(d)(4).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* § 1935(e)(2) (referencing 7 U.S.C. § 2003(e)). The relevant USDA regulations reflect these same classifications too—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 761.2(b).

### Contract Land Sales Program, 7 U.S.C. § 1936[*]

*Description*: The Secretary must "guarantee a loan made by a private seller of a farm or ranch to a qualified beginning farmer or rancher or socially disadvantaged farmer or rancher . . . on a contract land sales basis." 7 U.S.C. § 1936(a).

*Classification*: These loan guarantees are exclusively limited to beginning and socially disadvantaged farmers or ranchers.

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* (referencing 7 U.S.C. § 2003(e)). The relevant USDA regulations reflect these same

classifications too—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 761.2(b).

**Farm Ownership Relending Program, 7 U.S.C. § 1936c[*]**

*Description*: "The Secretary may make loans to eligible entities . . . so that the eligible entities may relend the funds to individuals and entities" "for projects that assist heirs with undivided ownership interests to resolve ownership and succession on farmland that has multiple owners." 7 U.S.C. § 1936c(a), (c).

*Classification*: Eligible entities are limited to those with "experience assisting socially disadvantaged farmers and ranchers" as well as other identified groups such as beginning farmers, rural businesses, or credit unions. *Id.* § 1936c(b). The Secretary must give preference to entities "with not less than 10 years of experience serving socially disadvantaged farmers and ranchers." *Id.* § 1936c(d)(1).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on race. *Id.* § 1936c(b)(2) (referencing 7 U.S.C. § 2279(a)). The relevant USDA regulations list specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 769.151 (incorporating definitions from 7 C.F.R. § 761.2).

**Individual Development Accounts Pilot Program, 7 U.S.C. § 1983b[*]**

*Description*: The Secretary is authorized to make grants to qualified entities to operate "demonstration programs," by which the entities fund individual development accounts for beginning farmers to be used for qualified expenditures such as the purchase of farmland, breeding stock, or certain trees. 7 U.S.C. § 1983b(b)(1), (5).

*Classification*: "In considering an application to conduct a demonstration program under this section, the Secretary shall give preference to an application from a qualified entity that demonstrates . . . a track record of serving clients targeted by the program, including, as appropriate, socially disadvantaged farmers or ranchers . . . ." *Id.* § 1983b(c)(3).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* § 1983b(c)(3)(A) (referencing 7 U.S.C. § 2003(e)). USDA regulations provide no additional guidance.

## Agricultural Credit—Security Servicing, 7 U.S.C. § 1985[*†]

*Description*: To preserve the security for USDA loans, the Secretary may "offer to sell real property that is acquired by the Secretary" if the "order and method of sale" set forth in the statute is followed. 7 U.S.C. § 1985(a), (c)(1).

*Classification*: The Secretary must offer the real property "to a qualified beginning farmer or rancher or a socially disadvantaged farmer or rancher" before offering it to any other farmer. *Id.* § 1985(c)(1)(B), (C). An applicant may request "an expedited review and determination" of whether they qualify as socially disadvantaged. *Id.* § 1985(c)(6)(A). The Secretary must "maintain statistical data" on these determinations and notify relevant congressional committees if the review process "is adversely affecting the selling of farm inventory property to beginning farmers or ranchers or socially disadvantaged farmers or ranchers." *Id.* § 1985(c)(6)(C). The Secretary generally may not lease such property but can do so to beginning and socially disadvantaged farmers or ranchers under certain conditions. *Id.* § 1985(c)(5).

There is no definition of "socially disadvantaged farmers or ranchers" given in this section or chapter, and the section does not reference any other statute defining the term. Under the relevant USDA regulations, however, one's status for purposes of farm loans hinges on race and sex—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 761.2(b).

## Agricultural Credit—Homestead Protection, 7 U.S.C. § 2000[*]

*Description*: The Secretary is authorized to allow a borrower of a loan made or insured by USDA "to retain possession and occupancy of homestead property" upon foreclosure, bankruptcy, or liquidation under specific conditions. 7 U.S.C. § 2000(b).

*Classification*: Socially disadvantaged farmers and ranchers "have a right of first refusal to reacquire the homestead property." *Id.* § 2000(c)(4)(B).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* (referencing 7 U.S.C. § 2003(e)). The relevant USDA regulations reflect these same classifications too—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 761.2(b).

## Agricultural Credit—Target Participation Rates, 7 U.S.C. § 2003[*]

*Description*: The Secretary is required to "establish annual target participation rates, on a county wide basis, that shall ensure that members of socially disadvantaged groups will receive [USDA real estate] loans . . . and will have the opportunity to purchase or lease inventory farmland." 7 U.S.C. § 2003(a)(1).

*Classification*: Socially disadvantaged groups are defined by this section as any "group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities." *Id.* § 2003(e)(1). The relevant USDA regulations reflect these same classifications too—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 761.2(b).

### Agricultural Credit—Guaranteed Farm Loans, 7 U.S.C. § 2008b[†]

*Description*: The Secretary is authorized to make and guarantee real estate and operating loans for various agricultural purposes. *See* 7 U.S.C. §§ 1923, 1942.

*Classification*: "In the case of a loan guaranteed by the Secretary . . . to a socially disadvantaged farmer or rancher . . . or a qualified beginning farmer or rancher, the Secretary may provide for a standard guarantee plan, which shall cover an amount equal to 95 percent of the outstanding principal of the loan." *Id.* § 2008b.

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* (referencing 7 U.S.C. § 2003(e)). The relevant USDA regulations reflect these same classifications too—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 761.2(b).

### Agricultural Credit—Reporting, 7 U.S.C. § 2008x[*]

*Description*: The Secretary is authorized to make and guarantee real estate and operating loans for various agricultural purposes. *See* 7 U.S.C. §§ 1923, 1942.

*Classification*: The Secretary must annually report to Congress on "actual loans made or guaranteed as measured against target participation rates for beginning and socially disadvantaged farmers." *Id.* § 2008x(b)(1)(C). She must also regularly report "the extent to which target annual participation rates for beginning and socially disadvantaged farmers (as defined by the Secretary) are being met for each loan type." *Id.* § 2008x(c)(1).

Under the relevant USDA regulations, one's status as socially disadvantaged for purposes of this program hinges on race and sex—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 718.2; *see also id.* § 718.1(a) ("This part is applicable to all programs specified in chapters VII and XIV of this title that are administered by the Farm Service Agency . . . ."); *id.* § 2.42(a)(63)(i) (delegating the administration of reporting under 7 U.S.C. § 2008x to the Farm Service Agency).

**Land Access Reporting Requirements, 7 U.S.C. § 2204i**

*Description*: In 2019, the Secretary was required to submit a report to Congress identifying, among other things, "barriers that prevent or hinder the ability of" beginning and socially disadvantaged farmers and ranchers to acquire farmland; "the extent to which Federal programs . . . are improving" farmland access for these farmers; and "the regulatory, operational, or statutory changes that are necessary to improve" farmland access and tenure for these farmers. 7 U.S.C. § 2204i(a). She must also regularly collect data on "trends in farmland ownership, tenure, transition, barriers to entry, profitability, and viability" for beginning and socially disadvantaged farmers or ranchers, including by surveying these farmers or ranchers. *Id.* § 2204i(b).

*Classification*: The section refers to a statutory definition of "socially disadvantaged" that classifies based on race. *Id.* § 2204i(a)(1) (referencing 7 U.S.C. § 2279(a)). USDA regulations provide no additional guidance.

**Farming Opportunities Training and Outreach, 7 U.S.C. § 2279[*]**

*Description*: The Secretary must "encourage and assist socially disadvantaged farmers and ranchers, veteran farmers and ranchers, and beginning farmers and ranchers in the ownership and operation of farms and ranches through . . . education and training; and . . . equitable participation in all agricultural programs of the Department." 7 U.S.C. § 2279(b). The Secretary "may make grants to, and enter into contracts and other agreements with, an eligible entity that has demonstrated an ability to" assist the Secretary in "reaching current and prospective socially disadvantaged farmers or ranchers and veteran farmers or ranchers" and "improving [their] participation . . . in Department programs." *Id.* § 2279(c)(3)(B), (4)(A). Similar grants are also available for outreach to beginning farmers and ranchers. *Id.* § 2279(d).

*Classification*: The entire section aims to increase outreach and support for socially disadvantaged farmers or ranchers, among others. As noted, grants are made available based on an entity's proven ability to serve socially disadvantaged farmers. *Id.* § 2279(c)(3)(B), (4)(A). Two provisions give socially disadvantaged farmers increased access to administrative decisionmakers. At least five percent of funds for beginning-farmer development grants must be allocated annually to programs for socially disadvantaged farmers, among others. *Id.* § 2279(*l*)(4)(A). In carrying out the programs, the Secretary must "seek . . . input" from various stakeholder groups, including socially disadvantaged farmers, and devote "additional personnel" to implementing the program "[i]n counties or regions" where "the number of socially disadvantaged farmers and ranchers or veteran farmers and ranchers exceeds 25 percent of the total number of farmers or ranchers" in the area. *Id.* § 2279(f), (g)(2).

Still other provisions require data collection and reporting on socially disadvantaged farmers. The section requires an annual report to relevant congressional committees that includes data on socially disadvantaged farmers or ranchers, such as the number "served and outcomes of such service," the "problems and barriers" to increasing participation by socially disadvantaged farmers, and "[a]ctions taken by the Secretary in partnership with eligible entities to enhance [such farmers'] participation in agricultural programs." *Id.* § 2279(c)(4)(D); *see also id.* § 2279(k) (requiring further reporting to Congress on socially disadvantaged farmers). The Secretary must also study the level of participation by socially disadvantaged farmers in USDA procurement, contracting, and purchasing and "ensure . . . that the Census of Agriculture and studies carried out by the Economic Research Service accurately document the number, location, and economic contributions of socially disadvantaged farmers or ranchers in agricultural production." *Id.* § 2279(h), (j).

The program also calls for at least one grant to be made to a college or university for the establishment of "a policy research center to be known as the 'Socially Disadvantaged Farmers and Ranchers Policy Research Center' for the purpose of developing policy recommendations for the protection and promotion of the interests of socially disadvantaged farmers and ranchers." *Id.* § 2279(c)(5).

The section defines a "socially disadvantaged farmer or rancher" as "a farmer or rancher who is a member of a socially disadvantaged group." *Id.* § 2279(a)(5). "Socially disadvantaged group" is in turn

defined as "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." *Id.* § 2279(a)(6). The relevant USDA regulations reflect these same classifications too—though they do not specify which racial groups qualify. *See* 7 C.F.R. § 2500.103 (referencing 7 U.S.C. § 2279(a)).

**Transparency and Accountability for Socially Disadvantaged Farmers, 7 U.S.C. § 2279-1**

*Description*: This section includes data-collection and disclosure requirements intended to "ensure compilation and public disclosure of data to assess and hold the Department of Agriculture accountable for the nondiscriminatory participation of socially disadvantaged farmers and ranchers in programs of the Department." 7 U.S.C. § 2279-1(a).

*Classification*: The Secretary must "annually compile program application and participation rate data regarding socially disadvantaged farmers or ranchers" by county and state for each USDA program and make the data publicly available. *Id.* § 2279-1(c)(1), (3)–(4).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* § 2279-1(b) (referencing 7 U.S.C. § 2003(e)). USDA regulations provide no additional guidance.

**Fair and Equitable Treatment of Socially Disadvantaged Producers, 7 U.S.C. § 2279a[*]**

*Description*: The Secretary must ensure that identified statutes are applied to farms that are owned or operated by socially disadvantaged producers, among others, consistent with the intended benefits of those statutes. 7 U.S.C. § 2279a(a)–(b). The Comptroller General was required in 1995 to submit to Congress a report on the representation of socially disadvantaged producers on specific administrative committees across the country. *Id.* § 2279a(c).

*Classification*: The section defines "socially disadvantaged producer" as "a producer who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities." *Id.* § 2279a(d). USDA regulations provide no additional guidance.

**Agriculture and Food Research Initiative, 7 U.S.C. § 3157**

*Description*: The Secretary is authorized to "make competitive grants for fundamental and applied research, extension, and education to address food and agricultural sciences." 7 U.S.C. § 3157(b)(1).

*Classification*: This grant program is limited to identified priority areas, one of which is addressing "barriers and bridges to entry and farm viability" for socially disadvantaged farmers and ranchers. *Id.* § 3157(b)(2)(F)(viii).

There is no definition of "socially disadvantaged farmers or ranchers" given in this section or chapter, and the section does not reference any other statute defining the term. Nor do the applicable USDA regulations define the term. *See* 7 C.F.R. § 3400.2.

**Greenhouse Gas Technical Assistance Provider and Third-Party Verifier Program, 7 U.S.C. § 6712***

*Description*: The Secretary is authorized to create an Advisory Council to provide technical assistance to entities that conduct desirable environmental activities such as reducing emissions through fuel choice, on-farm energy generation, and reforestation. 7 U.S.C. § 6712(b)(2), (c)(2), (f)(1).

*Classification*: The Advisory Council must "include beginning, socially disadvantaged, limited resource, and veteran farmers." *Id.* § 6712(f)(2)(B)(ii). To that end, at least one member from a nongovernmental or civil society organization must "represent the interests of socially disadvantaged groups" on the Council. *Id.* § 6712(f)(2)(C)(viii). Among other duties, the Council must advise the Secretary on how to reduce barriers to entry for socially disadvantaged farmers (among others) into environmental credit markets. *Id.* § 6712(f)(4)(C)(v). The Council was required to submit an assessment on that topic in 2023. *Id.* § 6712(g)(2)(A)(vii).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* § 6712(a)(8) (referencing 7 U.S.C. § 2003(e)). USDA regulations provide no additional guidance.

**Office of Partnerships and Public Engagement, 7 U.S.C. § 6934***

*Description*: This section establishes the Office of Partnerships and Public Engagement, which is responsible for "improv[ing] access to [USDA] programs" and "improv[ing] the viability and profitability" of socially disadvantaged farmers or ranchers, among other groups. *Id.* § 6934(b)(1). Among the Office's duties are "establishing and monitoring . . . goals and objectives . . . to increase participation in [USDA]

programs . . . by small, beginning, socially disadvantaged, or veteran farmers or ranchers" and "measuring outcomes of the programs" for these farmers. *Id.* § 6934(c)(1), (5). Within the Office, the Secretary was directed to establish the Socially Disadvantaged Farmers Group, which is charged with carrying out the provisions of section 2279 as well as "other duties to improve access to, and participation in, programs of the Department by socially disadvantaged farmers or ranchers." *Id.* § 6934(d)(2), (4)(A).

*Classification*: The section refers to a statutory definition of "socially disadvantaged" that classifies based on race. *Id.* § 6934(a)(3) (referencing 7 U.S.C. § 2279(a)). So, too, do USDA regulations—though they do not specify which racial groups qualify. *See* 7 C.F.R. § 2500.103 (referencing 7 U.S.C. § 2279(a)).

### Noninsured Crop Assistance Program, 7 U.S.C. § 7333[*]

*Description*: The Secretary must offer disaster assistance for eligible crops up to certain amounts based on individual yields. 7 U.S.C. § 7333(a).

*Classification*: The Secretary must waive the service fee required for assistance to socially disadvantaged farmers or ranchers—"as defined by the Secretary"—as well as to beginning and veteran farmers or ranchers. *Id.* § 7333(k)(2). These same groups also pay 50 percent of the normal premium required to receive an assistance payment. *Id.* § 7333(*l*)(3).

Under the relevant USDA regulations, one's status as socially disadvantaged for purposes of this program hinges on race and sex—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 718.2; *see also id.* § 718.1(a) ("This part is applicable to all programs specified in chapters VII and XIV of this title that are administered by the Farm Service Agency . . . ."); *id.* § 1437.1 (noninsured crop assistance program regulations fall under chapter XIV).

### National Food Safety Training, Education, Extension, Outreach, and Technical Assistance Program, 7 U.S.C. § 7625[*]

*Description*: The Secretary must award grants "to provide food safety training, education, extension, outreach, and technical assistance" to farm owners and operators. 21 U.S.C. § 399c(d); *see* 7 U.S.C. § 7625(a).

*Classification*: "In awarding grants under this section, the Secretary shall give priority to projects that target . . . socially disadvantaged farmers," among other groups. 7 U.S.C. § 7625(c).

There is no definition of "socially disadvantaged farmers" given in this section or chapter, and the section does not clearly reference any other statute defining the term. USDA regulations provide no additional guidance.

**Biomass Crop Assistance Program, 7 U.S.C. § 8111[*]**

*Description*: This program is intended to "support the establishment and production of eligible crops for conversion to bioenergy" and "assist agricultural and forest land owners and operators with the collection, harvest, storage, and transportation of eligible material for use in a biomass conversion facility." 7 U.S.C. § 8111(b). The Secretary must "provide financial assistance" in the form of direct payments for these purposes to a producer in a designated project area. *Id.* § 8111(c)(1); *see also id.* § 8111(c)(5), (d)(2). Payments for establishing eligible crops are generally capped at $500 per acre. *Id.* § 8111(c)(5)(B)(i).

*Classification*: In selecting project areas, the Secretary must consider "the participation rate" of socially disadvantaged farmers or ranchers as well as of beginning farmers or ranchers. *Id.* § 8111(c)(2)(B)(v). Crop-establishment payments to socially disadvantaged farmers or ranchers have a higher cap of $750 per acre. *Id.* § 8111(c)(5)(B)(ii).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on race. *Id.* § 8111(a)(9) (referencing 7 U.S.C. § 2279(a)). The relevant USDA regulations reflect these same classifications too—though they do not specify which racial groups qualify. *See* 7 C.F.R. § 1450.2.

**Agricultural Commodity Support Programs—Base Acreage, 7 U.S.C. §§ 8711, 8752[*]**

*Description*: For agricultural commodity support programs that depend on farm acreage, this section sets forth criteria for calculating and adjusting base acreage. Farms with ten base acres or less are ineligible for certain support payments. 7 U.S.C. § 8711(d)(1). The same limitation applies to peanut farms under a separate section. *Id.* § 8752(d)(1).[1]

*Classification*: The prohibitions on payments to farms and peanut farms with less than ten base acres do not apply to socially disadvantaged

---

[1] Note that the provisions for payment under both relevant subchapters have been repealed, meaning the classifications may currently have no practical effect. *See* Pub. L. No. 113-79, §§ 1101, 1102(a), 1103(a), 128 Stat. 649, 658 (2014).

farmer or ranchers, or to "limited resource" farmers or ranchers. *Id.* §§ 8711(d)(2), 8752(d)(2).

Both sections refer to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* (referencing 7 U.S.C. § 2003(e)). USDA regulations provide no additional guidance.

**Agricultural Commodity Coverage Policy—Payment Acreage, 7 U.S.C. § 9014**[*]

*Description*: "For the purpose of price loss coverage and agriculture risk coverage," this section sets forth criteria for calculating a farm's "payment acres" as a function of base acreage. 7 U.S.C. § 9014(a)(1). Farms with ten payment acres or less are generally ineligible for certain coverage payments. *Id.* § 9014(d)(1).

*Classification*: The prohibition on payments to farms with less than ten payment acres does not apply to socially disadvantaged farmer or ranchers or to "limited resource," beginning, or veteran farmers or ranchers. *Id.* § 9014(d)(2).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* (referencing 7 U.S.C. § 2003(e)). The relevant USDA regulations reflect these same classifications too—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 718.2; *see also id.* § 718.1 ("This part is applicable to all programs specified in chapters VII and XIV of this title that are administered by the Farm Service Agency . . . ."); *id.* § 1412.51 (commodity coverage regulations fall under chapter XIV).

**Dairy Margin Coverage Payments, 7 U.S.C. § 9054**[*]

*Description*: Under this section, "[a]ll dairy operations in the United States shall be eligible to participate in dairy margin coverage to receive dairy margin coverage payments." 7 U.S.C. § 9054(a). "Each participating dairy operation" must "pay an administrative fee" to register for dairy margin coverage and then annually thereafter. *Id.* § 9054(c)(1).

*Classification*: Among others, socially disadvantaged farmers—"as defined by the Secretary"—are "exempt from the administrative fee." *Id.* § 9054(c)(4).

Under the relevant USDA regulations, one's status for purposes of this program hinges on race and sex—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 1430.402.

**Supplemental Agricultural Disaster Assistance, 7 U.S.C. § 9081**[*]

*Description*: This section provides for direct payments to relieve farms that have experienced specified disasters. The Secretary must use certain funds to aid in the reduction of losses to livestock, honey bees, or farm-raised fish caused by "disease . . . , adverse weather, or other conditions." 7 U.S.C. § 9081(d)(1).

*Classification*: The provision on relief for losses to livestock, honey bees, and farm-raised fish does not state how much relief the Secretary must provide to any given producer, except in the case of socially disadvantaged ("as determined by the Secretary"), beginning, limited-resource, and veteran farmers or ranchers. *Id.* § 9081(a)(1), (d)(4). For these producers, the Secretary is required to cover 90 percent of the covered losses. *Id.* § 9081(d)(4).

Under the relevant USDA regulations, one's status for purposes of this program hinges on race and sex—designating specific races and one sex group (women) as socially disadvantaged. *See* 7 C.F.R. § 718.2; *see also id.* § 718.1 ("This part is applicable to all programs specified in chapters VII and XIV of this title that are administered by the Farm Service Agency . . . ."); *id.* § 1416.1 (supplemental agricultural disaster assistance program regulations fall under chapter XIV).

### Conservation Planning Technical Assistance, 16 U.S.C. § 590c

*Description*: "As a condition to the extending of [conservation] benefits" to nonfederal farmland, the Secretary is authorized to require "[t]he payment of user fees for conservation planning technical assistance." 16 U.S.C. § 590c.

*Classification*: The Secretary may waive the user fees for assistance provided to socially disadvantaged farmers, among others. *Id.* § 590c(4)(C).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* (referencing 7 U.S.C. § 2003(e)). USDA regulations provide no additional guidance.

### Environmental Quality Incentives Program, 16 U.S.C. §§ 590h, 3839aa, 3839aa-2, 3841[*]

*Description*: This program aims "to promote agricultural production, forest management, and environmental quality as compatible goals, and to optimize environmental benefits." 16 U.S.C. § 3839aa. To those ends, the Secretary must "provide technical assistance, cost-share payments, and incentive payments to operators" to encourage certain practices. *Id.*

§ 590h(b)(1). To assist in carrying out the program, the Secretary is required to establish county, area, and local committees within each state. *Id.* § 590h(b)(5).

*Classification*: Payments to socially disadvantaged farmers or ranchers, among others, are higher than "the amount that would otherwise be provided to a producer under" the program. *Id.* § 3839aa-2(d)(4)(A) (raising the percentage cap on payments and ensuring that payments are "not less than 25 percent above the otherwise applicable rate"). Fifty percent of such a payment must be provided in advance to cover purchasing and contracting costs. *Id.* § 3839aa-2(d)(4)(B)(i). Moreover, for fiscal years 2009 through 2031, five percent of the funds appropriated for this program must be used "to assist socially disadvantaged farmers or ranchers." *Id.* § 3841(h)(1).

The Secretary must "develop procedures to maintain representation of socially disadvantaged farmers and ranchers" on program committees. *Id.* § 590h(b)(5)(B)(ii)(III). She must also "solicit and accept nominations from organizations representing the interests of socially disadvantaged groups" for committee membership. *Id.* § 590h(b)(5)(B)(iii)(III)(bb). Election procedures, too, must "ensure fair representation of socially disadvantaged groups." *Id.* § 590h(b)(5)(B)(iii)(VII)(bb). The Secretary must also report to Congress "the rate of loss or gain in participation by each socially disadvantaged group, by race, ethnicity, and gender" after each Census of Agriculture. *Id.* § 590h(b)(5)(B)(v)(II).

Section 590h refers to a statutory definition of "socially disadvantaged" that classifies based on both race and sex. *Id.* § 590h(b)(5)(B)(iii)(III)(bb) (referencing 7 U.S.C. § 2003(e)). USDA regulations list specific races and one sex group (women) as socially disadvantaged for purposes of committee representation. *See* 7 C.F.R. § 7.3. For purposes of financial benefits under the program, USDA regulations tether one's status as socially disadvantaged to race—though the regulations do not specify which racial groups qualify. *See id.* § 1466.3.

**Emergency Conservation Program—Water Conservation Cost Sharing, 16 U.S.C. § 2202a**[*]

*Description*: "The Secretary is authorized to make payments to agricultural producers who carry out emergency water conservation or water enhancing measures . . . during periods of severe drought as determined

by the Secretary." 16 U.S.C. § 2202. Generally, such payments may "not exceed 75 percent of the total allowable cost, as determined by the Secretary." *Id.* § 2202a(a).

*Classification*: The percentage cap on water conservation payments is higher (90 percent) for socially disadvantaged farmers or ranchers, as well as limited-resource and beginning farmers. *Id.* § 2202a(b).

The section refers to a statutory definition of "socially disadvantaged" that classifies based on race. *Id.* (referencing 7 U.S.C. § 2279(a)). The relevant USDA regulations reflect these same classifications too—though they do not specify which racial groups qualify. *See* 7 C.F.R. § 701.2.

**Soil Health and Income Protection Pilot Program, 16 U.S.C. § 3831c[*]**

*Description*: As part of a broader conservation program, this section authorizes the Secretary to "establish a voluntary soil health and income protection pilot program under which eligible land is enrolled through the use of contracts to assist owners and operators of eligible land to conserve and improve the soil, water, and wildlife resources of the eligible land." 16 U.S.C. § 3831c(b)(2)(A).

*Classification*: Contracts with socially disadvantaged farmers or ranchers—which status is "determined by the Secretary"—and with beginning, limited-resource, and veteran farmers or ranchers must include preferential terms whereby "the actual cost of establishment of [a] conserving use cover crop" is shared between USDA and the owner, each paying 50 percent. *Id.* § 3831c(b)(3)(E)(i). The annual rental rate USDA pays owners under these contracts is also higher for owners in these classes (75 percent versus 50 percent for other owners). *Id.* § 3831c(b)(3)(E)(ii); *cf. id.* § 3831c(b)(3)(B).

The chapter refers to a statutory definition of "socially disadvantaged" that classifies based on race. *Id.* § 3801(a)(23) (referencing 7 U.S.C. § 2279(a)). The relevant USDA regulations list specific races as socially disadvantaged. *See* 7 C.F.R. § 1410.2.

**Conservation Reserve Program, 16 U.S.C. § 3835[†]**

*Description*: The Secretary is authorized to enroll land "through the use of contracts to assist owners and operators of land . . . to conserve and improve the soil, water, and wildlife resources of such land and to

address issues raised by State, regional, and national conservation initiatives." 16 U.S.C. § 3831(a).

*Classification*: One of the potential reasons for modifying a contract under the program is "to facilitate a transition of land subject to the contract from a retired or retiring owner or operator to a beginning farmer or rancher or socially disadvantaged farmer or rancher." *Id.* § 3835(c)(1)(B)(iii). The section sets forth special procedures for such land transfers and provides certain rights to socially disadvantaged farmers, like pretransition access to the farmland "to make conservation and land improvements." *Id.* § 3835(f).

The chapter refers to a statutory definition of "socially disadvantaged" that classifies based on race. *Id.* § 3801(a)(23) (referencing 7 U.S.C. § 2279(a)). The relevant USDA regulations list specific races as socially disadvantaged. *See* 7 C.F.R. § 1410.2.

### Conservation Reserve Programs—Administrative Incentives, 16 U.S.C. § 3844[†]

*Description*: "In carrying out any conservation program administered by the Secretary, the Secretary may provide to" specified people or entities "incentives to participate in the conservation program." 16 U.S.C. § 3844(a)(1).

*Classification*: Administrative incentives are available, at the Secretary's discretion, to socially disadvantaged farmers or ranchers, as well as beginning, limited-resource, and veteran farmers or ranchers. *Id.* § 3844(a)(2).

The chapter refers to a statutory definition of "socially disadvantaged" that classifies based on race. *Id.* § 3801(a)(23) (referencing 7 U.S.C. § 2279(a)). The relevant USDA regulations reflect these same classifications too—though they do not all specify which racial groups qualify. *See* 7 C.F.R. §§ 1410.2, 1465.3, 1467.3, 1468.3.

### Regional Conservation Partnership Program, 16 U.S.C. § 3871e[*]

*Description*: The Secretary is authorized to enter into a partnership agreement to "implement a project that will assist producers with installing and maintaining an eligible [conservation] activity on eligible land." 16 U.S.C. § 3871b(a).

*Classification*: In administering this program, "the Secretary and eligible partners shall conduct outreach to" socially disadvantaged farmers

and ranchers, among others, "to encourage participation by those producers in a [covered conservation] project." *Id.* § 3871e(d).

The chapter refers to a statutory definition of "socially disadvantaged" that classifies based on race. *Id.* § 3801(a)(23) (referencing 7 U.S.C. § 2279(a)). The relevant USDA regulations reflect these same classifications too—though they do not specify which racial groups qualify. *See* 7 C.F.R. § 1464.3.

**Women, Infants, and Children Farmers' Market Nutrition Program, 42 U.S.C. § 1786**

*Description*: Using available appropriations, the Secretary must award grants to states for "the establishment or maintenance of programs designed to provide" access to "fresh, nutritious, unprepared foods at farmers' markets." 42 U.S.C. § 1786(m)(1).

*Classification*: The Secretary must authorize states to use up to "2 percent of total program funds . . . to promote the development of farmers' markets in socially or economically disadvantaged areas, or remote rural areas, where individuals eligible for participation in the program have limited access to grown fruits and vegetables." *Id.* § 1786(m)(5)(F)(ii).

There is no further definition of "socially or economically disadvantaged areas" given in this section or chapter, and the section does not reference any other statute defining the term. Nor do the applicable USDA regulations define the term. *See* 7 C.F.R. § 248.2.